## Case No. 8,812.

### McGREW et al. v. The MELNOTTE.

[1 Bond, 453.] [1]

District Court, S. D. Ohio. June Term, 1861.

COLLISION—BOAT ASTERN—RIGHT OF WAY—COMPETENT WATCH.

1. A boat astern attempting to pass one that is ahead, is held to stricter vigilance and greater precaution than are required of the latter.

2. The boat ahead is under no obligation to give way or to change her course to facilitate the passage of the boat which is astern, and the latter, having a choice of the time and place to pass, incurs all the risk of the attempt.

3. This principle applies with great force and stringency when the boat making the attempt to pass is lightly laden and easily controlled, and the other is moved with difficulty.

4. To entitle the libellants to indemnity for their loss, they must not only show that their adversary is in fault, but that in the management of their boat there was no material error to which the collision can be charged.

5. The absence of a competent and vigilant watch, constantly employed to assist and advise the pilot in his duty, is prima facie evidence of fault in the boat thus deficient.

[Cited in The Ancon, Case No. 348.]

[Libel for damages by Robert McGrew and others against the steamboat Melnotte.]

Lincoln, Smith & Warnock, for libellants.
Dodd & Huston, for claimants.

OPINION OF THE COURT. This is a libel in rem against the steamboat Melnotte, in which damages are claimed for a collision with a coal barge in tow of the steamboat Hornet. The libel is in the usual form, averring that the loss and injury sustained were occasioned by the sole fault of the Melnotte. The answer takes issue on this allegation, and charges that the collision was caused wholly by the faulty management of the Hornet. The depositions of a number of witnesses have been taken by the parties to sustain the theory of the collision insisted on by each; and, as usual in such cases, the evidence on some essential points is in direct conflict. I have carefully considered the evidence, but do not propose to analyze it critically in stating my views. While this conflict in the statements of the witnesses unavoidably involves the facts in some uncertainty, the conclusion I have reached seems to be well sustained by the preponderance of the testimony offered by the libellants, as fortified by the fair presumptions and probabilities of the case. The collision took place about eleven o'clock in the night of April 26, 1860, on the Ohio river, just below the village of Newport, on the Ohio side. The Hornet is a stern-wheel steamboat, then employed as a tow-boat in the transportation of coal from Pittsburg to Cincinnati. At the time of the collision she was descending the river with seven heavily laden barges, five

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

of which were near the bow, and two directly in the rear of the five, on either side of the boat. It is not controverted that the Hornet was properly equipped and manned as a tow-boat, and had the proper signal-lights, in good condition, at the time, and also that there was a light placed in the forward part of each of the front or wing barges. The Melnotte is a passenger boat of considerable power and speed, and, at the time of the collision, was also descending the river. A short distance above the village of Newport, she was astern of the Hornet, and attempt-ed to pass that boat, on the Ohio or starboard side, nearly opposite the village. The Hornet, with her barges, being about one hundred feet in width, was descending near the middle of the river, probably a little nearer the Virginia than the Ohio shore, and in the usual place for a down boat. The river at that point is not less than four hundred yards wide, and at the time was in a good stage for navigation, there being at least twelve feet of water in the entire width of the river. It appears that just below Newport there is a projection of rocks on the Virginia side, extending out some twenty-five yards, and nearly opposite these rocks, on the Ohio side, there is a deposit of logs and snags reaching out some thirty or forty yards from the shore, leaving still a naviga-ble width of more than three hundred yards. There appears to have been nothing to hin-der the Melnotte from passing down on the larboard or Virginia side of the Hornet, if her pilot had decided to take that side. In passing the Hornet, a little below Newport, and nearly opposite the rocks on the Virginia side, and the logs and snags on the Ohio side, the larboard side of the Melnotte came in contact with the starboard wing barge of the Hornet with such force as to crush in the planks, and cause it to take water rapidly, and, shortly after, to sink. This suit is pros-ecuted to recover compensation for the in-jury to the barge, the coal lost as the result of its sinking, and for the delay and expense resulting from the collision.

The theory of the libellants, on which they claim a decree in their favor, is that the Hornet with her cumbrous tow was at the point of the collision, in her right place, near the middle of the river, and pointing straight down the stream; and that the Melnotte, in passing, suddenly veered from a straight course toward the Hornet, and as a conse-quence of this erroneous movement, was brought in contact with the barge. On the other hand, the respondents set up in their answer, and insist that the evidence proves, that the Melnotte was in her right place, pointed straight down the river, and that the collision was caused by the improper di-vergence of the Hornet from her line of navi-gation toward the Ohio shore. It is proper to notice here that this is not the ordinary case of a collision between two boats passing in opposite directions. Both were descend-

ing the river. And it was the undoubted right of the Melnotte, being a fast passenger boat, to get ahead of the tow-boat. But the law is well settled, that a boat astern at-tempting to pass one that is ahead, is held to stricter vigilance and greater precaution than are required of the latter. The boat ahead is under no obligation to give way, or to change her course, to facilitate the passage of the boat which is astern. And the latter, having a choice of the time and place to pass, incurs all the risk of the attempt, and unless the forward boat is guilty of a clear error of navigation, will be responsible for all the consequences of such an attempt. The Gov-ernor [Case No. 5,645]. This principle ap-plies with greater force and stringency to a case like the present, where the boat mak-ing the attempt to pass is lightly laden, and easily controlled, and the other, from its cumbrous attachments, is moved with diffi-culty, and requires a good deal of time to effect a change of course. I am not to be un-derstood, in referring to this principle, as as-serting or intimating that the Hornet is not responsible for any fault of navigation which may be clearly established by the proofs, leading to the collision which occurred. It is noticed solely as justifying a more rigid rule of accountability as applicable to the Melnotte than applies to the Hornet. For, if from any cause there was difficulty or danger in passing, it was incumbent on the Melnotte to have stopped, and to have waited for a more favorable opportunity to effect her pur-pose.

I proceed to notice, very briefly, the general bearing and aspect of the evidence on the question, to which of these boats is the fault attributable, by which the libellants have suffered loss. It is a familiar principle of the maritime law, that to entitle them to indem-nity for the whole of their loss, they must not only show that their adversary is in fault, but that in the management of their boat there was no material error, to which the col-lision can be charged. To sustain their claim, the evidence of the master and pilot on watch at the time of the collision, and of one of the crew stationed as a watch on the barges, has been introduced. They swear that the Hor-net was in the proper place of a descending boat, pointed straight down the river, and that the Melnotte, just before the collision, veered from her course toward the Hornet, and struck the wing barge, as already no-ticed. The phase of the occurrence thus pre-sented by these witnesses, leaves no doubt as to which boat was in fault. And, if they are entitled to credit, there can be no hesita-tion in the conclusion that the respondents' boat was guilty of a palpable error, quite suf-ficient to charge upon her the responsibility for the damage which has been sustained. But the respondents have introduced the dep-ositions of the pilot and carpenter of the Melnotte, and other persons who were on the boat at the time, to prove that there was no

divergence from her proper line of navigation, and that the collision is wholly due to a change in the course of the Hornet, by which she was turned from her straight course downward, to the Ohio shore, and thus her starboard wing barge was brought in contact with the Melnotte.

Upon these contradictory views of the facts, the question for decision is upon the preponderance of the evidence. And, really, I can see no sufficient ground for the rejection of the testimony of the witnesses for the libellants as untrue or incredible. These witnesses were in the most favorable position to know the exact course and position of the Hornet before and when the collision occurred. They are before the court without any impeachment of their moral characters, and so far as the court can know, have testified with fairness and candor. It would require the most satisfactory opposing evidence, to justify the court in repudiating their testimony. Now, it is true, that they are contradicted by the pilot of the Melnotte, and others on that boat. The pilot swears positively that his boat was heading straight down the river when the collision occurred, and the other witnesses for the respondents state it as their belief and opinion that such was her course. It is to be remarked, however, in regard to all these witnesses, that they seem not to have been apprised of the proximity of the two boats, until they were within some twelve or fifteen feet of each other. The collision occurred almost instantaneously after, and it is not strange that, from the darkness of the night, and the excitement of the occasion, they should have mistaken the position of the boats, at the moment of, and immediately after the collision. But if there is any ground for a doubt, arising from the conflicting statements of the witnesses as to the facts connected with the collision, it is removed by the strong probabilities of the case. These directly sustain the theory of the collision, as claimed by the libellants. It is stated both by their witnesses and those testifying for the respondents, that very shortly before the collision, the Hornet was in her proper place, and pointed straight down the river. The respondents insist that she suddenly changed her course, and veered toward the Ohio side, and thus struck the Melnotte. But she could have had no possible object or motive in such a change of course; and it is exceedingly improbable, that with seven coal boats in tow, rendering it difficult to change her position from side to side, she should have diverged from the course she was pursuing. Besides, it is doubtful, if from the time she is conceded to have been in her right course, to the time of the collision, she could have changed her line of navigation so far as to have been in the position described by the respondent's witnesses, when the collision occurred. Such a movement could not have been made but with great difficulty and a considerable lapse of time. The probabilities, I think, are strongly in favor of the conclusion, that from the darkness of the night, or some other cause, the pilot of the Melnotte was apprehensive of running on the logs or snags along the Ohio shore, and to avoid this suddenly turned his boat toward the Virginia side, and thus struck the barge of the Hornet.

There is another fact which may properly be adverted to, as bearing on the question of fault. It is clear from the evidence that the Melnotte had no sufficient lookout, preceding and at the time of the collision. The master, whose watch it was, was sick and not on duty, and there was no one on the deck as a lookout, but the carpenter of the boat. It was no part of his duty to act in that capacity, nor is there any evidence that he was at all qualified for the duty. It has been often held by the supreme court of the United States, that on boats navigating the western waters, a competent and vigilant watch should be constantly employed to assist and advise the pilot in his duties; and that the absence of such a watch is prima facie evidence of fault in the boat thus deficient. [The Genesee Chief v. Fitzhugh] 12 How. [53 U. S.] 459; [Ward v. Chamberlain] 21 How. [62 U. S.] 570; [Haney v. Baltimore Steam Packet Co.] 23 How. [64 U. S.] 293. If, in the case before the court, the question of fault was left in doubt, by reason of the conflict in the testimony as to the circumstances of the collision, the want of a competent and sufficient watch on the Melnotte furnishes legal presumption that she was in the wrong. I am clear, therefore, in the opinion, that the Melnotte must be held responsible for the injury which has resulted from the collision, and accordingly decree against her for damages. These will embrace the value of the coal lost, the cost of repairing the barge, and the expenses of the steamboat during the time she was delayed, with interest from the time of the collision. The evidence on these points seems to be full and clear, and the decree will be for the sum proved, on the basis indicated.